# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

**FILED**

APR **1 9** 2019

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| **In the Matter of the Search of**<br>202 Royal Avenue, St. Louis, Missouri 63135, (hereafter **Subject Location #1**) which is more fully described as a single-family, residence. The brick residence faces north to Royal Avenue, and has white-framed windows, and a dark-colored roof. The residence is located at the intersection of Royal Avenue and Nancy Place. The address numbers "202" are affixed above the front door. | Case No. 4:19 MJ 1191 JMB |

## APPLICATION FOR A SEARCH WARRANT

I, _____ Andrew Frank _____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

202 Royal Avenue, St. Louis, Missouri 63135, (hereafter **Subject Location #1**) which is more fully described as a single-family, residence. The brick residence faces north to Royal Avenue, and has white-framed windows, and a dark-colored roof. The residence is located at the intersection of Royal Avenue and Nancy Place. The address numbers "202" are affixed above the front door. Photographs of said property attached. See "Attachment 1."

located in the _____ EASTERN _____ District of _____ MISSOURI _____, there is now concealed

see attached LIST ("Attachment 2").

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

✓ evidence of a crime;
✓ contraband, fruits of crime, or other items illegally possessed;
✓ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, U.S.C., §§ 846, 841(a)(1)<br>Title 18, U.S.C., §§ 922 and 924(c) | Conspiracy to possess with intent to distribute controlled substance(s); felon in possession of a firearm, use of a firearm in furtherance of drug trafficking |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

✓ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrew Frank, Special Agent
Federal Bureau of Investigation
*Printed name and title*

**Sworn to before me and signed in my presence.**

Date: _____ 4/19/19 _____

_____
*Judge's signature*

City and State: _____ St. Louis, MO _____

Honorable John M. Bodenhausen, U.S. Magistrate Judge
*Printed name and title*
AUSA: James C. Delworth

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Andrew Frank, being duly sworn, depose and state as follows:

## I. INTRODUCTION

I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice.  I have been employed with the FBI for over three years, and have been assigned to the St. Louis Field Division for approximately the last three years, working both in the Safe Streets Gang Task Force and the Safe Streets Violent Crime Task Force.  In connection with my official FBI duties, I investigate criminal violations of the Controlled Substances Act.  I have received specialized training in the enforcement of federal narcotics laws, and I have been involved in all aspects of narcotics trafficking investigations, including (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking; (b) surveillance; and (c) analysis of documentary and physical evidence.  I have also received training and participated in investigations involving the interception of wire communications and other electronic communications.  Finally, I have testified in grand jury proceedings for violations of federal narcotics laws.  Based on my training and experience as an FBI Special Agent, I am familiar with the ways in which narcotics dealers conduct their drug-related business, including, but not limited to, their methods of importing and distributing narcotics; their use of telephones, and their use of numerical codes and code words to identify themselves, the nature of the communication and/or to conduct their transactions; and their concealment of drug proceeds in real and personal property as well as legitimate businesses.

I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct

1

investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

I have, through training and experience, become familiar with and utilized all normal methods of investigation including, but not limited to, visual surveillance, interviewing witnesses, the use of search and arrest warrants, the use of confidential sources, the use of pen registers, the utilization of undercover agents and the use of court authorized wiretaps. I am also familiar with methods of searching locations where narcotics and/or narcotic proceeds may be found. I have been involved in multiple drug investigations and have been involved in numerous arrests for narcotics related crimes.

This affidavit is made in support of a search warrant for the following locations for evidence related to the distribution of illicit narcotics in violation of Title 21, United States Code, 841(a)(1) and 846, as well as Title 18, U.S.C. 922 and 924(c) (hereinafter referred to as the **"Subject Offenses"**):

    a) Residential home (hereafter **Subject Location #1**), located at 202 Royal Avenue, St. Louis, Missouri 63135, which is more fully described as follows: a single-family, residence. The brick residence faces north to Royal Avenue, and has white-framed windows, and a dark-colored roof. The residence is located at the intersection of Royal Avenue and Nancy Place. The address numbers "202" are affixed above the front door. Copies of photographs of said property are attached hereto and marked as Attachment 1, incorporated herein by reference. Utilities records for this location listed Chantel D. Neal (DOB 07/02/1976), known to be Kevin **NEAL**'s wife or ex-wife, as resident.

    b) Residential home (hereafter **Subject Location #2**), located at 2139 Cherry Avenue, St. Louis, MO 63121, which is more fully described as follows: a single-family, residence. The two-story house faces southwest to Cherry Avenue and is comprised of a light gray exterior with white-framed windows, a white garage door, and a fenced-in front porch. The residence is located on the northwest side of Cherry Avenue, approximately half-way between St. Louis Avenue and the Cherry Avenue dead end. Copies of photographs of said property are attached hereto and marked as Attachment 1, incorporated herein by reference. Utilities records list no occupant for this location or most of the other locations on the street. However, SLCPD surveillance observed Kevin **NEAL** present at this

location with a woman identified Chelsea M. Anderson (DOB 03/16/1991), believed to be a resident of the location and either a girlfriend, stepdaughter or other relation to Neal.

c) Residential home (hereafter **Subject Location #3**), located at 1564 Wellston Place, St. Louis, Missouri 63133, which is more fully described as follows: a single-family residence. The two-story residence faces northwest to Wellston Place, and has yellow exterior siding with white-framed windows. The property yard is enclosed in a chain link fence. The residence is located south of the intersection of Rock Brook Avenue and Wellston Place. The address numbers "1564" are affixed to the side of the house near the front door. Copies of photographs of said property are attached hereto and marked as Attachment 1, incorporated herein by reference. Utilities records for this location list Shelley L. Neal (DOB 03/15/1974, believed to be the sister or stepsister of Kevin **NEAL** and mother of Donnell **JONES**, as resident.

d) Motor vehicle (hereafter **Subject Vehicle**) registered to Kevin **NEAL**, described as follows: a 2007 Chevrolet Silverado 4-door truck, white in color, with tinted windows and black fender flares, VIN: 2GCEC13C371609218, Missouri license plates: 7DX 649.

The statements contained in this affidavit are based in part on information provided by Special Agents and Task Force Officers of the FBI, and Police Officers with the St. Louis County Police Department (SLCPD), and written reports about this and other investigations which I have received, directly or indirectly, from agents, information gathered from the service of administrative subpoenas, the result of searches, seizures, and surveillance conducted by the FBI, and/or agents and local police from the SLCPD, a review of telephone toll records and pen register information, a review of consensually recorded telephone calls, all independent investigation by the FBI, and from information gathered from cooperating witnesses, and on my experience and background. Since this affidavit is being submitted for the limited purpose of securing authorization for the acquisition of search warrants for the **Subject Locations** and the **Subject Vehicle**, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the necessary foundation for securing authorization for establishing probable cause for a search warrant for the aforementioned properties.

3

## II. INVESTIGATION

In February of 2019, FBI Task Force Officers began an investigation into Kevin **NEAL** and his nephew, Donnell **JONES**. As part of the on-going investigation, controlled purchases of narcotics from **NEAL** and **JONES** have been coordinated using a confidential human source (CHS).[1] **NEAL** is believed to be distributing quantities of crack-cocaine, heroin, and marijuana to numerous identified and unidentified individuals in the St. Louis area. The CHS identified **JONES** as a distributor operating from **Subject Location #3** in cooperation with several associates. CHS information indicated that **NEAL** supplies **JONES** and associates at **Subject Location #3** with marijuana, cocaine, and heroin. **NEAL** has prior felony convictions for possession with intent to distribute cocaine, probation violations, possession of marijuana, and manufacturing/delivery of a controlled substance. **JONES** has no known criminal history.

On February 20, 2019, investigators completed a controlled purchase of heroin from **NEAL**. Investigators and CHS met at a secure location and the CHS was outfitted with a covert transmitter device to allow investigators to monitor the drug transaction between CHS and **NEAL**. The CHS contacted **NEAL** and ordered up $100 worth of heroin. Investigators provided CHS with $100 in previously recorded St. Louis County buy funds, and both the CHS and vehicle were searched for contraband, with negative results. The CHS contacted **NEAL** by telephone, and **NEAL** directed him/her to **Subject Location #3**. Surveillance units in place observed **NEAL** arrive at **Subject Location #3**, driving the **Subject Vehicle**. Units followed the CHS to the same location, observed the CHS enter the **Subject Vehicle**, and observed the two complete the deal.

---

[1]     The CHS is cooperating with law enforcement for monetary compensation. The CHS previously cooperated with St. Louis County Detectives on prior cases and information he/she provided has been found consistently reliable. The CHS was opened as a SLCPD Confidential Informant (CI) for the first three controlled purchases from NEAL (February 20, 2019; February 27, 2019; and March 7, 2019) and as an FBI CHS for the last two (March 20, 2019; April 2, 2019).

After the deal, surveillance followed the CHS from **Subject Location #3**, met him/her at a neutral staging location, and seized the suspected heroin.  No field test was conducted because of the possible presence of fentanyl.  However, based on investigators' training and experience, the color, texture, and appearance of the substance seized was consistent with heroin.

On February 27, 2019, investigators completed a second controlled purchase of heroin from **NEAL**.  Investigators and CHS met at a secure location and the CHS was outfitted with a covert transmitter device.  CHS contacted **NEAL** by telephone and ordered up $160 worth of heroin.  **NEAL** directed the CHS to **Subject Location #3**.  Investigators then provided the CHS with $160 in buy money, and both the CHS and vehicle were searched for contraband, with negative results.  The CHS proceeded to **Subject Location #3**, arrived, and parked in front of the location.   By this time, investigators had identified **Subject Location #1** as **NEAL**'s primary residence.[2]  Surveillance units in place at **Subject Location #1** observed **NEAL** exit the residence front door, enter the **Subject Vehicle,** depart the location, and proceed directly to **Subject Location #3**.  On arrival at **Subject Location #3**, **NEAL** parked in front of the residence.  The CHS approached the **Subject Vehicle**, entered the passenger side, and completed the deal.  The CHS departed the **Subject Vehicle** and left the location.  Surveillance followed the CHS from **Subject Location #3**, met at a neutral staging location, and seized suspected heroin.  No field test was conducted because of the possible presence of fentanyl.  However, based on investigators' training and experience, the color, texture, and appearance of the substance seized was consistent with heroin.  Surveillance followed **NEAL** as he departed **Subject Location #3** in the **Subject**

---

[2]  This location was determined with assistance of a PLW information obtained from a State of Missouri Search Warrant signed on February 21, 2019, by Judge Wade Vincent.  The search warrant allowed investigators to obtain location information of SPRINT/NEXTEL cellular phone bearing number (314)687-8690, known to be the cellular telephone used by **NEAL**.

**Vehicle**. **NEAL** returned directly to **Subject Location #1**, exited the **Subject Vehicle,** and entered the front door.

On March 7, 2019, investigators completed a third controlled purchase of heroin from **NEAL**. Investigators and CHS met at a secure location and the CHS was outfitted with a covert transmitter device. CHS contacted **NEAL** by telephone and ordered up $200 worth of heroin. **NEAL** directed the CHS to **Subject Location #3**. The CHS was provided with $200 in previously recorded St. Louis County buy funds. The CHS and vehicle was searched for contraband, with negative results. By this time, investigators had identified **Subject Location #2** as the residence of **NEAL**'s girlfriend. Surveillance units in place at **Subject Location #2** observed **NEAL** exit the front door of the residence and enter the **Subject Vehicle**. The CHS placed a second telephone call to **NEAL** indicating that he/she had arrived at **Subject Location #3**, but he/she indicated that there were marked police units nearby. **NEAL** directed the CHS to proceed to the intersection of Wellsmar Avenue and Ben McLemore Place, a few blocks from **Subject Location #3**. On **NEAL**'s arrival at the new location, the CHS approached the **Subject Vehicle**, entered the passenger door, and completed the deal. The CHS departed the **Subject Vehicle**, entered the CHS vehicle, and left the location. Surveillance units followed the CHS from the meeting location to a neutral staging location and seized suspected heroin. No field test was conducted because of the possible presence of fentanyl. However, based on investigators' training and experience, the color, texture, and appearance of the substance seized was consistent with heroin. Surveillance followed **NEAL**, who departed the meeting location in the **Subject Vehicle**. **NEAL** arrived at **Subject Location #3**, parked there for several minutes and interacted with **JONES** and several other subjects from the residence. Several hand-to-hand deals were observed between subjects present at **Subject Location #3** at this time. **NEAL** then departed **Subject Location #3** in the **Subject**

**Vehicle**, proceeded directly to **Subject Location #2**, exited the **Subject Vehicle**, and entered the front door of the residence.

On March 20, 2019, investigators completed a controlled purchase of narcotics from **NEAL**.  Investigators and CHS met at a secure location and the CHS was outfitted with a covert transmitter device.  CHS contacted **NEAL** and attempted to order up $200 worth of heroin.  **NEAL** indicated that he did not have a supply of heroin that he was willing to sell, but would be able to provide the requested heroin within several hours, once he was re-supplied.  After several hours of waiting, the CHS contacted **NEAL**, again to inquire whether he would be able to provide the requested heroin.  **NEAL** stated that he was still waiting for a supply, and that the CHS was one of several other buyers waiting to purchase heroin.  However, **NEAL** indicated that he could provide marijuana to the CHS within a short time at **Subject Location #3**.  Investigators directed the CHS to proceed with the deal based on considerations associated with maintaining the CHS's cover.  The CHS was provided with $160 in buy money.  The CHS and vehicle was searched for contraband, with negative results.  The CHS proceeded to **Subject Location #3**.  Surveillance units in place at **Subject Location #1** observed **NEAL** exit the front door of the residence and enter the **Subject Vehicle**.  Units followed **NEAL** to **Subject Location #2**, where he exited the **Subject Vehicle** and entered the residence.  After a short time, **NEAL** departed this location in the **Subject Vehicle** and proceeded directly to **Subject Location #3**, followed by surveillance.  On **NEAL**'s arrival at **Subject Location #3**, the CHS approached the **Subject Vehicle**, entered the passenger side, and completed the deal.  The CHS departed the **Subject Vehicle** and left the location.  Surveillance followed the CHS from the meeting location to a neutral staging location and seized 30 grams of suspected marijuana.  Based on investigators' training and experience, the color, texture, odor, and appearance of the substance seized was consistent with marijuana.

Surveillance followed **NEAL**, who departed **Subject Location #3** in the **Subject Vehicle**, returned directly to **Subject Location #2**, and entered the front door of the residence.

On April 2, 2019, investigators completed a fourth controlled purchase of heroin from **NEAL**. Investigators and CHS met at a secure location and the CHS was outfitted with a covert transmitter device. The CHS was provided with the $260 in buy money, and both the CHS and the CHS vehicle were searched for contraband, with negative results. Surveillance units in place at **Subject Location #1** observed **NEAL** exit the front door of the residence and enter the **Subject Vehicle**. **NEAL** then drove from the Royal address over to a business called "Groom Theory Lounge" located at 51 Florissant Oaks Shopping Center, Florissant, MO 63031. Neal was accompanied by a black male, approximately 5 years old, believed to be his son. Both **NEAL** and the young male entered the business. A short time later, Neal and the young male emerged out of the business and returned to the **Subject Vehicle**. The CHS contacted **NEAL** by telephone and ordered up $200 worth of heroin. **NEAL** again directed the CHS to meet at **Subject Location #3**. **NEAL** drove the **Subject Vehicle** to the Berkeley area, where he pulled into the driveway of a residence located at 6226 Langdon Ct. **NEAL** removed the young male from the **Subject Vehicle** and walked the child inside the 6226 Langdon Ct. residence. A short time later **NEAL** returned alone to the **Subject Vehicle** and drove directly to **Subject Location #3**. Prior to **NEAL**'s arrival, the CHS had made contact with **JONES** at **Subject Location #3**. Numerous other individuals were present at the location, and the CHS conversed with **JONES** and several other individuals coming in and out of the residence for approximately 30 minutes. The CHS observed that numerous individuals present at the location were armed. During this time, the CHS provided **JONES** with $60 in buy money in return for suspected marijuana. The CHS mingled with individuals at the residence until **NEAL** arrived. The CHS and investigators observed several hand-to-hand

8

transactions during this time.  When **NEAL** arrived, the CHS approached the **Subject Vehicle**, entered the passenger seat, and completed a deal for $200 worth of heroin.  The CHS observed a handgun present with **NEAL** in the **Subject Vehicle** at this time.  After completing the deal, the CHS entered his/her vehicle and departed the area for a secure location, followed by surveillance.  On arrival at the secure location, investigators seized both the suspected marijuana and suspected heroin.  No field test was conducted on the suspected heroin because of the possible presence of fentanyl.  However, based on investigators' training and experience, the color, texture, and appearance of the substance seized was consistent with heroin.  Likewise, the color, texture, odor, and appearance of the suspected marijuana was consistent with marijuana.  Surveillance observed **NEAL** depart from **Subject Location #3** in the **Subject Vehicle** after interacting with several individuals present at that location.  **NEAL** drove the **Subject Vehicle** directly to **Subject Location #2**, where he was observed entering the front door of the residence.

On April 11, 2019, SLCP the CHS provided information on FaceBook posts made by **JONES** involving **Subject Location #3**.  CHS information indicated that older posts showed individuals present within **Subject Location #3** smoking marijuana in the presence of supplies of marijuana and other suspected narcotics.  More recent posts included a notice that **JONES** had Percocet available as of April 9, a photograph of **JONES** armed with a handgun and located in the driveway next to **Subject Location #3**, and a photograph of **JONES** standing on the front porch of **Subject Location #3**, looking out from the porch to the street.  The caption of the photograph on the front porch of **Subject Location #3** referenced a supplier of "bud" from "out west" who **JONES** was apparently waiting for.

On April 15, 2019, investigators completed a controlled purchase of marijuana from **JONES** at **Subject Location #3**.  Investigators and CHS met at a secure location and the CHS was

outfitted with a covert transmitter device.  The CHS was provided with the $60 in buy money, and both the CHS and the CHS vehicle were searched for contraband, with negative results.  The CHS contacted **JONES** and attempted to order up $60 worth of marijuana.  **JONES** was not present at **Subject Location #3**, and stated that there was a police unit near the residence.  He suggested that he could sneak through the back yard of **Subject Location #3**, enter the residence, and complete the deal with the CHS.  The CHS and **JONES** agreed to delay the deal for approximately 30 minutes or until the police unit departed the area.  After approximately 30 minutes, the marked united left the area.  The CHS departed for **Subject Location #3**, followed by surveillance units.  Additional units in place near **Subject Location #3** observed **JONES** walking toward that location.  The CHS arrived at **Subject Location #3**, entered the residence, met **JONES** inside, and completed the deal.  **JONES** sold from a supply located on the living room table.  The CHS exited **Subject Location #3** and departed.  Surveillance followed the CHS from the meeting location to a neutral staging location and seized the suspected marijuana.  Based on investigators' training and experience, the color, texture, odor, and appearance of the substance seized was consistent with marijuana.

## III. BACKGROUND AND TRAINING

As part of my experience and training as a Special Agent and that of other special federal officers, special agents and police officers on the investigating team, we have accumulated information and training in the areas of narcotics-based economic crime.  I and other members of the investigating team have extensive experience interviewing defendants, witnesses, informants and others who have experience in the gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics trafficking.  Based upon the experience of myself and the investigating team and our participation in other pending and completed controlled substance and/or

financial investigations of ongoing, extensive narcotics distribution conspiracies involving

controlled substances and money, I know the following:

    a. It is common for drug dealers to secret contraband, proceeds of drug sales, and records of drug transactions in their residence or other buildings under their control.

    b. Drug traffickers frequently keep near at hand, in their residence or other buildings under their control, paraphernalia for packaging, cutting, weighing and distributing of drugs. These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

    c. Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  Drug traffickers commonly "front" (provide drugs on consignment) controlled substances to their clients. The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

    d. Drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and / or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with persons known to traffic in controlled substances or to facilitate such trafficking.  These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

    e. Drug traffickers take or cause to be taken photographs of them, their associates, their property and their product.  These traffickers frequently maintain these photographs in their residence or other buildings under their control.

    f. Persons involved in drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances.

    g. When drug traffickers amass large proceeds from the sale of drugs that the drug traffickers attempt to legitimize these profits.  I know that to accomplish these goals, drug traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.  They

11

maintain record of these transactions in their residence or other buildings under their control.

h. Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in narcotics prosecutions.

i. Drug traffickers frequently possess firearms and / or other weapons in their residence or other buildings under their control to protect their narcotics supplies and/or United States currency.

j. Drug traffickers frequently possess safes and / or other storage devices in their residence or other buildings under their control to protect their narcotics supplies and / or United States currency.

k. It is common for drug traffickers to travel to major distribution centers to purchase drugs and/or to arrange for its distribution elsewhere in the United States. After purchasing drugs, these drug traffickers will transport or cause to be transported, drugs to the areas in which they will distribute the drugs. The methods of transportation include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers. Records of their travel are frequently kept in their residence or other buildings under their control.

## IV. CONCLUSION

Based upon my analysis and review of the preceding information, I believe that probable cause exists indicating violations of Title 21, United States Code, Sections 846 and 841(a)(1) and Title 18, United States Code, Sections 922 and 924(c). Based upon the investigation by your affiant and other law enforcement officers, I believe that controlled substances, drug proceeds, and / or documents evidencing participation in drug trafficking will be found at the locations and in the vehicle indicated above. Specifically, during the course of the electronic and physical surveillance by investigators as described above, investigators have observed **NEAL** routinely travel to **Subject Locations #2** and **#3** in the **Subject Vehicle** after receiving a request from CHS to purchase narcotics. Investigators have also observed, again through physical and electronic surveillance, that **NEAL** routinely departs from and/or returns to **Subject Location #1** or **Subject Location #2** in the

12

**Subject Vehicle** after receiving the buy-money during the narcotics transaction, and performs narcotics sales in the **Subject Vehicle** while in the vicinity of **JONES**' residence, **Subject Location #3**. Investigators have observed **NEAL** interact with **JONES** and associates located at **Subject Location #3** prior to and directly following controlled purchases with the CHS, and received CHS information that **NEAL** is a supplier for **JONES** and his associates. Investigators have observed multiple hand-to-hand transactions occur between **JONES** and associates and buyers who drive or walk to **Subject Location #3**. During the time of these observations, **JONES** and his associates were observed to be regularly entering and exiting **Subject Location #3** between deals. The CHS has completed two controlled purchase of marijuana directly from **JONES** at **Subject Location #3**, and the second such purchase took place inside the house, from a supply located in the house. **NEAL, JONES**, and numerous associated have been observed to be armed during a number of the observed transactions. Also based on training and experience, investigators believe supplies of narcotics are routinely stored by **NEAL** at **Subject Locations #1** and **#2**, and by **JONES** at **Subject Location #3**; that **NEAL** uses the **Subject Vehicle** to routinely return proceeds of drug trafficking at **Subject Location #1** and **Subject Location #2**; and **NEAL** provides and receives money and narcotics to/from **JONES** and associates at **Subject Location #3**. FaceBook posts by **JONES** indicate regular use and storage of marijuana and other narcotics within **Subject Location #3**.

Based on the facts as construed by my training and experience and the training and experience of the investigative team, presented in the affidavit set forth, I believe that evidence as set forth in the attached "List", marked as Attachment "2", is contained within the above listed locations.

I submit this affidavit in support of search warrants for **Subject Location #1**, **Subject Location #2**, **Subject Location #3** and **Subject Vehicle** within the jurisdiction of the reviewing

Court. I have reviewed the description of both premises, and believe them to be an accurate, particularized descriptions of the premises to be searched at the addresses.

In view of the ongoing nature of the investigation, and the risk of harm to informants, to agents, and to the investigation which would exist should the information in this affidavit be prematurely disclosed, I respectfully request that this affidavit and associated records concerning these searches be sealed until further order of the Court.

_____
Andrew Frank
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me this _____19_____ day of April, 2019

_____
JOHN M. BODENHAUSEN
United States Magistrate Court Judge
Eastern District of Missouri

**ATTACHMENT 1**

Subject Location 1 – 202 Royal





2

Subject Location 2 - 2139 Cherry

 

Subject Location 3 – 1564 Wellston





5

## ATTACHMENT 2

Items to Be Seized

1. Controlled substances;

2. Paraphernalia for packaging, cutting, weighing and distributing of drugs, including but not limited to scales, plastic bags, and cutting agents;

3. Books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and/or firearms, and papers, tickets, notes, schedules, receipts, and other items related to travel or transportation;

4. Cellular telephones and/or landline telephones, telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service, digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines, address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with persons known to traffic in controlled substances or to facilitate such trafficking;

5. Photographs, in particular photographs of subjects, co-conspirators, assets, firearms, and/or of controlled substances;

6. United States Currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

7. Books, records, pay stubs, employment records, any documents relating to bank services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money;

8. Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys;

9. Firearms and/or other weapons; and

10. Safes and/or other storage devices, security systems, cameras, cables, recording devices, monitors, and other video surveillance equipment.